UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TERRY PEARSON, | ) |
|     Plaintiff, | ) |
| vs. | ) Case No. 4:18 CV 522 (JMB) |
| MYRON WOODSON, et al., | ) |
|     Defendants. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on defendants' motion for summary judgment. Plaintiff has filed a response in opposition and the issues are fully briefed. In addition, both parties filed motions seeking extensions of time. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

The events giving rise to this dispute occurred while plaintiff Terry Pearson was incarcerated at Northeast Correctional Center (NECC).[1] He filed suit pursuant to 42 U.S.C. § 1983, alleging that the defendants, corrections officers Myron Woodson and Brice Simmons, sprayed him with mace[2] and assaulted him in the course of completing a strip search, in violation of his Eighth Amendment rights. Defendants argue that they are entitled to qualified immunity and move for summary judgment.

### I. Background

On the morning of July 31, 2017, inmates in NECC's Housing Unit 6 were gathered in the gym building to be strip-searched for weapons following an assault on a female corrections

---

[1] Plaintiff was released from custody in November 2018. See Statement of Uncontroverted Material Facts ¶ 65 at n.1 [Doc. # 75-1 at 9].

[2] According to defendants, the substance was pepper spray.

officer. Complaint [Doc. # 1 at ¶¶ 1-2]. Hundreds of inmates were strip-searched that day. See Jason Woodhurst Affidavit at ¶ 4 [Doc. # 75-1 at 23].[3] In his verified complaint, plaintiff alleges that, while waiting to be searched, he asked to use the restroom. He was escorted to a restroom where defendant corrections officers Myron Woodson and Brice Simmons were assigned to search inmates. Complaint at ¶ 3; Defendants' Statement of Uncontroverted Material Facts (SUMF) at ¶ 10. [Doc. # 75-1 at 2]. Both defendants, who normally worked at Moberly Correctional Center, were specially assigned to assist in the searches at NECC and neither one knew plaintiff before this encounter. See Myron Woodson Affidavit at ¶¶ 1, 3-4, 6 [Doc. # 75-1 at 11]; Brice Simmons Affidavit. at ¶¶ 1-3 [Doc. # 75-1 at 16]. Defendants conducted the searches from the hallway outside the bathroom. Woodson visually searched the inmates while Simmons inspected their clothing. Woodson Aff. at ¶ 5; Simmons Aff. at ¶ 4; see also DVD titled "NECC B-Rec Hallway 7-21-17 A.M." Other inmates waiting to use the bathroom lined up in the gym. Affidavit of Loren Zartler at ¶¶ 4-5 [Doc. # 75-1 at 20].

Plaintiff alleges in his complaint that defendant Woodson instructed plaintiff to remove his clothing piece by piece. Plaintiff states that, after he removed his socks, he remained standing on top of his shower shoes. When Woodson asked plaintiff for the shoes, plaintiff asked him if he was going to "make him stand barefoot on the dirty restroom floor." Complaint at ¶¶ 5-6. According to plaintiff, defendant Woodson then placed his hand on his "mace can" and stated, "That wasn't a question," and plaintiff gave his shoes to defendant Woodson. Woodson then allegedly directed plaintiff to bend over and cough in a manner that plaintiff described as having "immense sexual overtones" that made him feel embarrassed and uncomfortable. ¶¶ 7-8. While he was dressing again, plaintiff asked Woodson his name but

---

[3] Defendants' exhibits are identified by the CM/ECF document and page numbers that appear in the red header.

could not understand the response. He asked again while he was putting on his sock. According to plaintiff, Woodson then swore and sprayed plaintiff's face and body with pepper spray. Id. at ¶¶ 9-10. Plaintiff alleges that both defendants then entered the bathroom, struck him, and slammed him into the sink and onto the ground. Plaintiff was cuffed and escorted to another housing unit. Plaintiff states that he was not verbally aggressive and made no attempt to fight back. Id. at ¶¶ 11-12.

Defendant Woodson testifies by affidavit that he handed plaintiff his underwear and socks after the search was completed. After plaintiff put on his underwear and one sock, he turned around to face Woodson. Plaintiff had what Woodson describes as a "stern look on his face" that conveyed, "If I had the opportunity, I would go at you." Plaintiff then slapped his hands together once or twice, "hard." Woodson Aff. at ¶ 7. Woodson told him to finish dressing and plaintiff responded that he did not have to get dressed and started flailing his arms. Id. at ¶ 9. Woodson then showed plaintiff his wrist restraints and directed him to turn around and face away from him. He told plaintiff, "Stand. Put your hands on your head. I will enter the bathroom and apply restraints." Plaintiff did not comply. Id. at ¶ 9. Woodson again instructed plaintiff to dress and come out and showed him the pepper spray, telling him that he would use it if plaintiff did not dress and come out. According to defendant Woodson, plaintiff was "getting loud, not dressing, not listening." Id. at ¶ 10. Woodson then "took the aerosol, aimed at the middle of [plaintiff's] face and sprayed for less than a second." Id. at ¶ 11. Woodson entered the bathroom to restrain plaintiff, but had to slow down because the residue of the spray made his eyes water and his nose run. According to Woodson, he helped plaintiff, who was flailing his arms, to lie down on the floor. Woodson applied restraints, helped plaintiff to stand up, and escorted him out of the bathroom. Woodson denies that he hit or struck plaintiff. Id. at ¶¶ 12-14.

3

Plaintiff had no visible injuries and was breathing and walking without difficulty. He did not voice any complaints about injuries to his ribs or any other part of his body. Woodson wrote a conduct violation against plaintiff for creating a disturbance. Id. at ¶¶ 16-18; see also Conduct Violation Report [Doc. # 1-2 at 1].

Defendant Simmons testifies by affidavit that he had searched the clothing of five inmates without incident before the search of plaintiff began. According to Simmons, plaintiff threw some of his clothes at Simmons, which Simmons considered aggressive. Simmons Aff. at ¶ 5. Simmons observed as Woodson directed plaintiff to dress and come out, saw plaintiff refuse, saw Woodson show plaintiff the handcuffs and direct him to turn around to be restrained, and saw plaintiff again refuse. Woodson then showed plaintiff the pepper spray and told him he would use it unless plaintiff dressed and came out of the bathroom. Plaintiff refused to dress and Simmons could see other inmates waiting to use the bathroom. Id. at ¶¶ 6-8. Woodson then sprayed plaintiff for less than a second from where he stood in the hallway. Woodson entered the bathroom and helped plaintiff to lie face down on the floor. Plaintiff was flailing his arms, however, and Woodson had difficulty grabbing them. Simmons "reached in the bathroom for a few seconds to hold the arms so that Woodson could grab [plaintiff's] wrists and apply the restraints." Id. at ¶ 9. Simmons denies striking or hitting plaintiff. Id. at ¶ 10. Simmons had "several good looks" at plaintiff in the hallway and saw no signs of trauma. He did not hear plaintiff complain about any injuries. Id. at ¶ 11.

Corrections Officer Zartler testifies by affidavit that he was overseeing a line of inmates waiting to use the bathroom. Zartler Aff. at ¶ 4. He saw defendants Woodson and Simmons standing in the hallway outside the bathroom searching an inmate he later learned was plaintiff. Woodson was speaking to plaintiff and directing the search while Simmons searched plaintiff's

4

clothing. Zartler states that plaintiff "was getting louder with Woodson" and that the inmates in the line became aware that "something was going on in the bathroom" that was causing a delay. Id. at ¶¶ 7-9. Zartler approached and looked in the bathroom to see if Woodson needed assistance.[4] He did not see Woodson or Simmons strike or hit plaintiff. The fumes from the pepper spray entered the hallway toward the inmates in line. Id. at 10-11. Zartler, who had a good view of plaintiff after he came out of the bathroom, did not see any evidence of injury. Id. at ¶ 12.

Corrections Officer Jason Woodhurst was also in the hallway in the vicinity of the bathroom where defendants searched plaintiff. Affidavit of Jason Woodhurst at ¶¶ 5-6 [Doc. # 75-1 at 23]. Woodhurst saw plaintiff as he left the bathroom in restraints. Plaintiff did not have any visible injury and had no difficulty walking or breathing. Id. at ¶ 9. Woodson arranged for plaintiff to be escorted to the medical unit and to Housing Unit 1. Id. at ¶ 10.

The Court has reviewed a video recording that begins before plaintiff is escorted to the bathroom.[5] The camera is placed in the ceiling of the hallway several feet from the bathroom doorway and does not capture any activity within the bathroom. The events depicted in the video are consistent with the description set forth above. Defendants stood side by side at the bathroom door during the search of plaintiff, with Simmons closer to the camera with Woodson on his far side. Simmons is shown searching plaintiff's clothes while Woodson speaks to plaintiff. The video shows that after some discussion Woodson extended his arm into the bathroom and then immediately entered the bathroom. Simmons bent forward slightly and reached in to the bathroom while using his feet to move plaintiff's clothing out of the doorway.

---

[4] The video of the incident shows Zartler approaching the bathroom before Woodson administered the spray.

[5] The recording does not include audio.

At no time did Simmons enter the bathroom. Zartler and Woodhurst peered in without entering. Nineteen seconds elapsed between when Woodson deployed the pepper spray and plaintiff was escorted out in handcuffs.

Medical records show that plaintiff was seen on August 1, 2017, the day after the search. He complained of rib pain in his right side. It was observed that plaintiff's breathing was even and unlabored, and there were no visible signs of injury. Four x-rays of plaintiff's right ribs were taken on August 2, 2017. [Doc. # 75-1 at 27-29, 37]. One of the four images showed "a lucency through the anterior aspect of the right seventh rib" that "may represent a nondisplaced fracture. Ribs are otherwise intact." [Doc. # 75-1 at 37]. Progress notes from medical encounters with plaintiff between August 1st and August 9th indicate that he did not have any complaints or signs of trauma. [Doc. # 75-1 at 29-35].

Additional facts will be included in the discussion as needed.

**II.     Legal Standard**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, a party moving for summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Once the moving party discharges this burden, the non-moving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Anderson, 477 U.S. at 247. The non-moving

6

party may not rest upon mere allegations or denials in the pleadings.  Id. at 256.  "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment.  Id. at 248. The Court must construe all facts and evidence in the light most favorable to the non-movant, must refrain from making credibility determinations and weighing the evidence, and must draw all legitimate inferences in favor of the non-movant.  Id. at 255.

Plaintiff has responded to defendants' legal arguments in opposition to defendants' motion.  He has not, however, filed a response to defendants' SUMF and, as a consequence, he is deemed to have admitted those facts.  See E.D. Mo. L.R. 4.01(E) ("All matters set for in the statement of [uncontroverted facts] shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.").  In determining whether there are genuine disputes of material fact, however, the Court has also considered the allegations set forth in plaintiff's verified complaint.  See Berry v. Doss, 900 F.3d 1017, 1022 (8th Cir. 2018) (court did not err in relying on allegations in verified complaints as evidence to conclude there were material issues of fact in dispute); Ward v. Moore, 414 F.3d 968, 970 (8th Cir. 2005) (providing a verified complaint made under threat of perjury "is the equivalent of an affidavit and can serve as [a plaintiff's] response to [a] defendant's summary judgment motion under Federal Rule of Civil Procedure 56(e)"); Spear v. Dayton's, 733 F.2d 554, 555–56 (8th Cir. 1984) (providing that a *pro se* litigant who has filed a verified affidavit is not "under a duty to repeat this verified allegation in a new affidavit").

### III.     Discussion

Plaintiff brings excessive force claims arising from Woodson's use of pepper spray, which is not disputed, and Woodson and Simmons's alleged use of direct physical force against him, which is disputed.

Defendants assert that they are entitled to qualified immunity. Qualified immunity shields government officials from liability in a § 1983 action unless their conduct violates a clearly established right of which a reasonable official would have known. Burnikel v. Fong, 886 F.3d 706, 709 (8th Cir. 2018) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To resolve a government official's claim of qualified immunity, courts apply a two-part test, asking whether the plaintiff has demonstrated a violation of a constitutional right and whether that constitutional right was clearly established at the time of the violation. Williams v. Jackson, 600 F.3d 1007, 1012 (8th Cir. 2010) (citing Harlow, 457 U.S. at 818). These questions may be addressed in either order. Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)). In cases involving more than one government official, as here, qualified immunity requires that each official's conduct be considered individually, "because a person may be held personally liable for a constitutional violation only if his *own* conduct violated a clearly established constitutional right." Burnikel, 886 F.3d at 709-10 (quoting Manning v. Cotton, 862 F.3d 663, 668 (8th Cir. 2017) (emphasis in original; internal quotation and citation omitted).

"To prove an Eighth Amendment violation, a prisoner must satisfy two requirements, one objective and one subjective." Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008). The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious. In excessive force cases, "guards are liable only if they are completely unjustified in using force, *i.e.*, they are using it maliciously and sadistically." Id. (citing Hudson v. McMillian, 503 U.S. 1, 9 (1992)). "The second requirement is subjective and requires that the inmate prove that the prison officials had a sufficiently culpable state of mind." Id. (internal quotation and citations omitted). In excessive force claims, the subjective inquiry is whether the force was used "in a

good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Id. (internal quotations and citations omitted).

The extent of an inmate's injury, "while material to the question of damages and informative as to the likely degree of force applied, is not in and of itself a threshold requirement for proving this type of Eighth Amendment claim." Williams v. Jackson, 600 F.3d 1007, 1012 (8th Cir. 2010). This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam). The extent of an inmate's injury may provide some indication of how much force was applied or whether the use of force could plausibly have been thought necessary in a particular situation. Id. (internal quotation and citations omitted).

### A. Pepper Spray

"After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Burns v. Eaton, 752 F.3d 1136, 1138 (8th Cir. 2014) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Id. at 1138-39. Officers are permitted to use force reasonably in a good-faith effort to maintain discipline, but force is not to be used "maliciously and sadistically to cause harm." Treats v. Morgan, 308 F.3d 868, 872 (8th Cir. 2002) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)); see also Jones v. Shields, 207 F.3d 491, 495 (8th Cir. 2000) ("core judicial inquiry" when prison officials are accused of using excessive force is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm).

9

Factors which inform this inquiry include the need for the application of physical force; the relationship between the need for physical force and the amount of force applied; and the extent of injury suffered by the inmate. Id. (citations omitted).

Plaintiff argues that defendant Woodson's use of pepper spray was objectively unreasonable because plaintiff was a "nonthreatening half-naked person." Response in Opposition [Doc. # 84 at 3]. According to plaintiff, Woodson first gestured to the pepper spray when plaintiff questioned whether he had to remove his shower shoes. Woodson did not deploy the pepper spray at that time, however, and only did so, according to plaintiff, after plaintiff twice asked for Woodson's name. Woodson asserts, and plaintiff does not contest, that he directed plaintiff to get dressed and go out to the gym before the pepper spray was deployed. Plaintiff also does not contest that the burst of pepper spray was very brief.

Accepting plaintiff's version of events for the purposes of this memorandum, the Court finds that defendant Woodson is entitled to qualified immunity on plaintiff's claim regarding the use of pepper spray.[6] Defendants were part of a deployment of corrections officers sent to NECC to complete strip searches following the assault of a female corrections officer. Hundreds of inmates were gathered in the nearby gym for searches and more inmates were lined up waiting to use the restroom. There was an objectively reasonable need to keep the search process moving and make the restroom available without unnecessary delay. Based on allegations in his complaint, plaintiff was on notice that Woodson was willing to use the pepper spray. Thus, this case is distinguishable from Treats, in which the Eighth Circuit affirmed the denial of summary judgment, in part because "the record at this stage does not suggest that Treats would have remained noncompliant if Morgan had given him clearer directions or issued a warning before

---

[6] There is no evidence that defendant Simmons played any role in the use of pepper spray and he is entitled to summary judgment on this claim.

spraying him in the face." Treats, 308 F.3d at 872. In addition, Woodson deployed a single, short burst of pepper spray, before immediately entering the bathroom to put restraints on plaintiff. See Jones v. Shields, 207 F.3d 491, 496 (8th Cir. 2000) ("limited application of [pepper spray] to control a recalcitrant inmate constitutes a 'tempered response by prison officials' when compared to other forms of force.") (citations omitted).

For the foregoing reasons, the defendants are entitled to qualified immunity on plaintiff's claims arising from the deployment of pepper spray.

### B.     Physical Force

Plaintiff alleges that, after Woodson deployed pepper spray, both defendants entered the bathroom and "began striking [him], then slamming [him] on the sink and then to the ground." Complaint at ¶ 11. The video recording establishes that defendant Simmons remained outside the bathroom the entire time. And, although he leaned his upper body into the bathroom after Woodson entered, the video recording does not show him "striking" or "slamming" plaintiff. Accordingly, defendant Simmons is entitled to summary judgment on plaintiff's claim arising from the use of physical force. Judgment in his favor will be entered at the conclusion of this case.

By contrast, defendant Woodson's actions once he entered the bathroom do not appear in the video. He testifies that he "helped [plaintiff] lie face down on the floor." Once plaintiff was on the floor, Woodson states that he "applied the restraints." Woodson testifies that he "did not hit or strike [plaintiff] in the bathroom." This testimony conflicts with plaintiff's allegations in his verified complaint that Woodson did strike him and slammed him into the sink, and thus there is a dispute of material fact. "At the summary judgment stage, granting qualified immunity is not appropriate where . . . a dispute remains regarding facts material to the qualified immunity

11

issue." Quraishi v. St. Charles Cty., Missouri, No. 4:16-CV-1320 NAB, 2019 WL 2423321, at *10 (E.D. Mo. June 10, 2019) (quoting Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1212 (8th Cir. 2013).

Defendant Woodson argues that he had no reason to strike plaintiff in order to secure him and, further, that doing would have been counterproductive because it might have prompted a violent response that triggered unrest among other inmates. A reasonable factfinder might find such an argument persuasive, but this is not a determination the Court can make at the summary judgment stage. Defendant Woodson also argues that plaintiff's excessive force claim fails because he cannot show he sustained an actual injury. As noted above, the "core judicial inquiry," is not "whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins, 559 U.S. at 37 (quotation and citation omitted). "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Id. at 38.

Because there is a dispute of material fact regarding the nature and degree of force used, the Court must deny summary judgment on plaintiff's claim that defendant Woodson used excessive force against him by striking him and slamming him on the sink and ground. A jury trial on this claim will be scheduled. The Court will grant the motion with respect to plaintiff's claim that defendant Woodson used excessive force by deploying pepper spray, and with respect to all claims against defendant Simmons.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment [Doc. # 74] is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that defendants' motion for extension of time to file summary judgment motion [Doc. # 70], plaintiff's motion for extension of the Case Management Order [Doc. # 72], and plaintiff's motion for leave to file out of time motion compel discovery [Doc. # 73] are **denied as moot**.

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of July, 2019.